UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

UNITED STATES OF AMERICA

                                        10 Cr. 131 (PKC)

            - v -

MOHAMED IBRAHIM AHMED,

            Defendant.

------------------------------------X


DEFENDANT MOHAMED IBRAHIM AHMED'S MEMORANDUM IN OPPOSITON TO THE
                GOVERNMENT'S 404(b) REQUEST


                                DAVID E. PATTON, ESQ.
                                Federal Defenders of New
                                York, Inc.

                                Attorney for Defendant
                                Mohamed Ibrahim Ahmed
                                52 Duane Street - 10th Floor
                                New York, New York 10007
                                Tel.: (212) 417-8713


        SABRINA P. SHROFF, ESQ.

            Of Counsel


TO:  PREET BHARARA, ESQ.
     United States Attorney
     Southern District of New York
     1 St. Andrew's Plaza
     New York, New York 10007

     Attn: STRAUBER/NAFTALIS/CRONAN/KOVNER
           Assistant United States Attorneys

For the reasons set forth below, the Court should deny the prosecution's request that it be allowed to offer the following at trial: (1) evidence that Mr. Ahmed attended the Khalden terrorist training camp in Afghanistan in the late 1990s; (2) evidence of Mr. Ahmed's "activities" prior to and in 2009 in Western Europe; (3) evidence regarding Mr. Ahmed's alleged activities in Mali in early 2009; and (4) evidence of a prior conviction for robbery in Sweden in 1994 and a prior conviction for credit card fraud in Germany in 2003.  This evidence is not admissible as direct evidence of the charged offenses and should be excluded pursuant to Rules 404(b) and 403.[1]

## ARGUMENT

**I.  EVIDENCE OF MR. AHMED'S ALLEGED ATTENDANCE AT KHALDEN AND HIS ACTIVITIES IN WESTERN EUROPE AND MALI PRIOR TO AND IN 2009 IS NOT ADMISSIBLE AS DIRECT EVIDENCE OF THE CHARGED CRIMES**

The government seeks to admit the testimony of a cooperating witness ("CW-1") who purportedly will testify about

---

[1] Should the Court allow testimony about the Khalden training camp, this court should not permit the government to make any reference to it as the "Khalden terrorist training camp", Government In Limine Motion (hereinafter "Gov't. Mot.) at 2, for three reasons.  First, there is no camp known as the Khalden terrorist camp in Afghanistan.  The camp is called the the Khalden Military Camp. Second, any reference to a "terrorist training camp" would usurp the function of the function as whether any place the defendant went to is terror-related is an issue of fact to be determined by the jury. Third, the prejudicial impact of the phrase "terrorist camp" simply can't be understated, nor can it be contained by a limiting instruction.

Mr. Ahmed's alleged attendance at the Khalden military training camp in Afghanistan in the late 1990s and Mr. Ahmed's alleged activities in Western Europe in 2009, before leaving for Somalia. The activities in Western Europe the government seeks to introduce include Mr. Ahmed's fortuitous encounter with CW-1 whom he had met at the Khalden camp, and their subsequent reminiscing about their time together at the Khalden camp. Govt. Mot. at 2.[2] The government also seeks to tell the jury that in early 2009, Mr. Ahmed attended a social gathering attended by "30 or 40 North Africans." According to the government, there was discussion of al Shabaab and al Qaeda, and feelings of support for both entities, Mr. at this gathering. Govt. Mot. at 2.

---

[2] Specifically, the government intends to elicit testimony from CW-1 that (1) in early 2009, CW-1 encountered Mr. Ahmed at the home of CC-2 in Western Europe and, at that meeting, he discussed with Mr. Ahmed their time at Khalden and another individual, Mohamed Moumou, and Mr. Ahmed said had engaged in credit card fraud with Moumou, (2) in early 2009, CW-1 encountered Mr. Ahmed at the home of CC-3 in Western Europe, observed Mr. Ahmed looking at an internet site for survival/camping equipment and a manual for a GPS device, and observed that Mr. Ahmed had a credit card with name "Mohammed Ibrahim," (3) in 2009, CW-1 saw defendant with CC-1, and (4) in or around 2009, CW-1 and Mr. Ahmed discussed various criminal activities that Mr. Ahmed was engaged in to raise money for jihad and CC-2's organization. (Gov't Mot. at 12-13.) Thus, the government seeks to introduce the Khalden camp at more than one juncture of the trial thereby increasing the likelihood of unfair prejudice.

The government also seeks to introduce evidence regarding Mr. Ahmed's alleged activities in Mali in 2009, after leaving Somalia. Here the government seeks not only to introduce Mr. Ahmed's interaction with another "jihadist group" but also that code sheets recovered from Mr. Ahmed years later allegedly were given to him in Mali.

The government contends all this evidence is admissible as direct evidence at trial because it provides "crucial background." (See Govt' Mot. at 19.) The government is wrong.

"[E]vidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'" United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997) (quoting United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989)). However, unless it is "manifestly clear . . . the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." United States v. Nektalov, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004); United States v. Kassir, No. 04-CR-356, 2009 WL 976821, *2 (S.D.N.Y. Apr. 9, 2009) (holding that evidence that merely provides context or background but is not inextricably

intertwined or necessary is not admissible as direct evidence of the crimes charged).  The proffered evidence here does not meet the Gonzalez criteria and cannot be considered direct evidence of the charged conspiracies; rather, this evidence is unquestionably "other crimes" evidence under Rule 404(b).

Evidence that Mr. Ahmed attended the Khalden training camp in Afghanistan in the late 1990s is "remote to the charged conduct in both time and place" and "is thus not essential in completing the story" with respect to the charged crimes. Kassir, 2009 WL 976821 at *3.  In United States v. Kassir, the government sought to admit evidence that the defendant had previously attended jihad training camps in other countries as direct evidence of the charged offenses, which included providing material support to a terrorist organization and attempting to establish a jihad training camp.  Id. at *2.  The government argued in Kassir, as it does here, that the uncharged criminal activities provided "context" to the charged offenses and was therefore admissible as direct evidence of the charged offenses.  The court, however, disagreed.  Rejecting the government's argument, Judge Keenan held that the evidence "must do more than provide context or be relevant" in order to be considered direct evidence not subject to Rule 404(b).  Id. Because the evidence did not meet the Gonzalez criteria, the

court held that it was inadmissible as direct evidence of the conspiracy and subject to Rule 404(b) analysis. Id. at *3.

For the same reasons discussed in Kassir, evidence of Mr. Ahmed's alleged attendance at the Khalden training camp approximately ten years prior to the conduct charged in the Indictment is not admissible as direct evidence of the charged offenses because it is not "inextricably intertwined" with the charged offenses, nor does it meet any of the other Gonzalez criteria.

Similarly, evidence regarding Mr. Ahmed's activities in Western Europe and Mali in 2009 is not admissible as direct evidence of any charged crime. Although the alleged conduct of attending a social gathering and reminiscing of their time at the Khalden camp is closer in time to the charged offense, neither the evidence of the conduct in Mali nor the evidence of conduct in Western Europe is "essential to completing the story." See Kassir, 2009 WL 976821 at *3.

The offenses charged in the pending indictment focus solely on Mr. Ahmed's alleged conduct in Somalia from January to November 2009. In contrast, the evidence the government seeks to admit is focus on alleged conduct in Western Europe and Mali that occurred before and after Mr. Ahmed's time in Somalia, and does not fall within the narrow Gonzalez criteria. Specifically, because the uncharged conduct of attending the Khalden camp or

his travel to Mali and subsequent return to Western Europe is not part of the same transaction as the charged conduct, is not inextricably intertwined with that conduct, and is not necessary to complete the story, it is inadmissible as direct evidence of the charged offenses and must be subject to a Rule 404(b) analysis.

## II. THE EVIDENCE SHOULD BE EXCLUDED UNDER RULE 404(B) BECAUSE IT IS NOT OFFERED FOR A PROPER PURPOSE AND BECAUSE THE SIGNIFICANT PREJUDICIAL EFFECT OUTWEIGHS ANY PROBATIVE VALUE

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). While the government emphasizes the Second Circuit's "inclusionary" approach to Rule 404(b), the Circuit has recently emphasized "that this inclusionary rule is not a *carte blanche* to admit prejudicial extrinsic act evidence where, as here, it is offered to prove propensity." United States v. Scott, — F.3d — , 2012 WL 1143579, at *5 (2d Cir. Apr. 6, 2012). As the Advisory Committee noted in its 1972 commentary to Rule 404(b), propensity evidence is particularly dangerous because it "tends to distract the trier of fact from the main question of what actually happened on the particular occasion" and "subtly permits the trier of fact to reward the good man and punish the

bad man because of their respective characters despite what the evidence in the case shows actually happened." Fed. R. Evid. 404(b) Advisory Committee's note.

To determine whether evidence is properly admitted under Rule 404(b), the Second Circuit has directed trial courts to consider (1) whether the evidence is offered for a proper purpose, (2) whether the evidence is relevant to a disputed issue, <u>and</u> (3) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice. The evidence the government seeks to admit must meet each of these three stringent tests to be admissible at trial. <u>See</u>, e.g., <u>United States v. Curley</u>, 639 F.3d 50, 56-57 (2d Cir. 2011).[3] Thus, for example, even if evidence is admissible for a proper purpose under Rule 404(b), such as for proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" (Fed. R. Evid. 404(b)(2)), the court must also conduct a Rule 403 balancing test, balancing the probative value of the evidence against the prejudicial effect. <u>Scott</u>, 2012 WL 1143579, at *10; Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the

---

[3] Even then, the trial court must administer an appropriate limiting instruction. <u>United States v. Curley</u>, 639 F.3d 50, 56-57 (2d Cir. 2011).

7

issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

The government pretends prejudicial evidence is somehow limited only to evidence "more inflammatory" than the conduct charged in the indictment. This is incorrect. <u>See United States v. Mercado</u>, 573 F.3d 138, 145 (2d Cir. 2009) (Droney, J., dissenting in part) (noting that an inflammatory effect is "only one way" in which evidence might cause unfair prejudice, and that "[e]vidence may also be unfairly prejudicial when, even though relevant to a fact in issue, it also tends so strongly to show the defendant's propensity to commit crimes that this tendency outweighs any probative value that the evidence might have"). In this case, the evidence is prejudicial not only because it is inflammatory, but also because its only true purpose is to demonstrate propensity -- that Mr. Ahmed engaged in activities related to terrorism at other times and in other places beyond what the Indictment charges, and that it is therefore more likely that he is guilty of the charged offenses.

In this case, the government's proffered evidence regarding Mr. Ahmed's activities in Afghanistan in the late 1990s, Western Europe in early 2009, and Mali in 2009 is inadmissible for two independent reasons. It is inadmissible under Rule 404(b) because it is offered to prove propensity. It is equally

inadmissible under Rule 403 because the prejudicial effect of this evidence substantially outweighs its probative value.

Finally, the government is able to establish that these individuals knew and trusted each other without presenting the jury with the most inflammatory of all facts – that the Khalden training camp is where the 911 plot was conceived and discussed.[4]

### A. Evidence of Mr. Ahmed's Alleged Attendance at Khalden in the Late 1990s

The government's attempt to introduce evidence that an individual saw Mr. Ahmed at the Khalden training camp in Afghanistan in the late 1990s "amounts to nothing more than a veiled attempt to do what Rule 404(b) prohibits – introduce bad acts evidence to show a propensity to commit such acts." Daniels v. Loizzo, 986 F. Supp. 245, 248 (S.D.N.Y. 1997). The government asserts that this evidence will be offered to show motive, intent, and capacity, as well as to corroborate the testimony of a government witness and provide background for the conspiracy. (See Gov't Mot. at 30-31, 33-38.) The true purpose of this evidence, however, is to inform the jury that Mr. Ahmed

---

[4] Mr. Ahmed objects to any testimony about the Khalden training camp in Afghanistan from Evan Kohlmann, the government's expert witness. First, Mr. Ahmed in papers to be separately filed objects to Mr. Kohlmann as an expert. Second, testimony about Afghanistan and any military type training camp there is irrelevant and not probative of the charged offenses. Finally, any testimony about an Afghanistani training camp would invoke 9-11-01, thereby changing the entire tone and fairness of this trial and make jury selection extremely difficult.

previously sought out military-type training from a terrorist organization (which one, the government's papers do not make clear), and that, for that reason, it is more likely that he is guilty of the charged offenses.

Evidence that Mr. Ahmed attended a military training camp in another country approximately ten years prior to the charged offense is not appropriate proof to establishing motive, intent, or capacity, given its remoteness in both time and place to the charged offense. See United States v. McCallum, 584 F.3d 471, 477 (2d Cir. 2009). Moreover, as the government well knows, al Shabaab was not in existence in the 1990s when Mr. Ahmed is alleged to have traveled to Afghanistan. The government's true purpose in seeking to admit this evidence is to tell the jury that Mr. Ahmed is a terrorist who should be convicted for that propensity. The Court should not permit it.

Even if this Court concludes that the evidence could be admissible for a proper purpose and not "as propensity evidence in sheep's clothing," see McCallum, 584 F.3d at 477, it must be excluded under Rule 403 because the probative value is minimal and the prejudicial effect significant and certain.

Evidence of the alleged attendance at Khalden lacks probative value because the conduct occurred in the early 1990s, long before the charged conspiracy, and sheds no light on whether Mr. Ahmed was in fact involved in the charged offenses,

which are alleged to have occurred in Somalia from January to
November 2009.  See United States v. Corey, 566 F.2d 429, 432
(2d Cir. 1977) (holding that the "minimal relevancy" of a prior
bad act was "further buttressed by its remoteness in time,"
having occurred between five and seven years before the charged
conduct).

The government further asserts the evidence of Mr. Ahmed's
attendance at Khalden is admissible to prove the relationship
between Mr. Ahmed and a co-conspirator (identified as "CC-2")
dates back to at least the 1990s.  (Gov't Mot. at 23.)
Importantly, however, the proffered testimony would establish
only that a third party "observed [Mr. Ahmed] in the company of
CC-2" at a social gathering and that Mr. Ahmed "spent a
substantial amount of time with CC-2" in the late 1990s.  (Id.)
Although the government contends this testimony explains the
development of the "illegal relationship" between CC-2 and Mr.
Ahmed and explains the "mutual trust" that exists between them,
all the testimony actually shows is that they were seen spending
time together in the late 1990s.  This is in no way probative of
how a relationship developed between Mr. Ahmed and CC-2 or what
mutual trust actually existed between them.  The Khalden
evidence, therefore, continues to lack probative value.

Because the testimony sheds no real light on the nature of
the relationship between Mr. Ahmed and CC-2, and because there

is a gap of approximately ten years between this prior bad act and the charged offenses, its probative value is minimal.

Moreover, the government has indicated that it will present other evidence, including recorded phone calls, to establish the relationship between Mr. Ahmed and CC-2. (See Gov't Mot. at 22.) Thus, there are adequate evidentiary alternatives to establish the nature of the co-conspirators' relationship, rendering the probative value of CW-1's testimony on this point even more limited. See Old Chief v. United States, 519 U.S. 172, 184 (holding that "what counts as the Rule 403 'probative value' of an item of evidence . . . may be calculated by comparing evidentiary alternatives").

Clinching the matter, the minimal probative value of such testimony is far outweighed by the certain prejudicial effect. There is a legitimate danger that if the jury hears evidence that Mr. Ahmed attended the Khalden training camp in Afghanistan, they will convict based not on actual evidence of his involvement in the charged conspiracy, but based on the fact that he is a bad person with a propensity to engage in terror-related activities. Or, based on the fact that he tried to or did attend the same military training camp as did others who then became terrorists. See United States v. Al-Moayad, 545 F.3d 139, 165-66 (2d Cir. 2008) (reversing a conviction and holding that admission of testimony regarding uncharged terrorist acts

created a "significant danger" that the jury was influenced by undue prejudice). For a jury made up of individuals from New York City, testimony that a defendant attended a terrorist camp in Afghanistan, in particular, would be highly prejudicial given the connection between Afghanistan and Osama bin Laden, al Qaeda, and September 11, 2011. Because there is a significant danger that this testimony would "lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged," United States v. Awadallah, 436 F.3d 125, 133 (2d Cir. 2006) (quoting Old Chief, 519 U.S. at 180), this Court should find that it is not admissible.

## B. Evidence of Mr. Ahmed's Activities in Western Europe in 2009

The government also seeks to admit testimony that at various unspecified times in 2009 CW-1 observed Mr. Ahmed at meetings with people that CW-1 understood to be supportive of al Qaeda and al Shabaab. The government has indicated that CW-1 is expected to testify that he had two personal interactions with Mr. Ahmed, first in early 2009 in Western Europe, when CW-1 spoke with Mr. Ahmed at a meeting at the home of CC-2 and "reminisced" with Mr. Ahmed about their time at Khalden. (Gov't Mot. at 12.) CW-1 is expected to testify that Mr. Ahmed told him that he had engaged in credit card fraud with another individual, Mohamed Moumou, in the 1990s, and that CW-1 knows

that Moumou engaged in this fraudulent activity in the 1990s to raise money to support jihad training camps in Afghanistan. (Id.) CW-1 is also expected to testify that he interacted with Mr. Ahmed a second time "in or around 2009" when they discussed various criminal activities in which Mr. Ahmed was involved. (Id. at 13.)

Significantly, none of the testimony relates in any way to Mr. Ahmed's plans, intentions, or motives with respect to the specific crimes charged in the indictment; that is, CW-1 has no knowledge of Mr. Ahmed's actual motives or intentions in connection with his travel to Africa in 2009. Thus, any connection to the charged crimes is entirely speculative, and the evidence cannot properly be admitted for the purposes of "completing the story" of the charged crimes, providing background to the charged conspiracy, or establishing Mr. Ahmed's intent or knowledge for purposes of the charged conspiracy. In other words, the proffered evidence is irrelevant. See United States v. Edwards, 342 F.3d 168, 177 (2d Cir. 2003) (holding that there must be some tangible connection between prior acts and the charged conduct that "makes the prior act relevant to proving the contested fact"); United States v. Gordon, 987 F.2d 902, 908 (2d Cir. 1993) (holding that in considering whether to admit evidence of other acts offered to

show knowledge, "the court must determine whether or not the evidence is relevant to that issue").

Because the evidence is not relevant to the charges, it cannot be properly admitted under Rule 404(b). <u>United States v. O'Connor</u>, 580 F.2d 38, 40 (2d Cir. 1978) ("The Government . . . must do more than disclaim an intention of proving that the defendant is a bad man. For what prosecutor in his right mind will ever offer that improper justification? Instead, the prosecutor must show that the evidence is relevant, and there is no presumption that it is.").

The government also alleges that the evidence is admissible because it corroborates Mr. Ahmed's post arrest statements in which he stated that he knew Moumou, CC-1, and CC-2. For "other act" evidence to be admissible to corroborate the testimony of a witness, the government must demonstrate "a close relationship between the proffered evidence and the evidence to be corroborated" and the evidence to be corroborated must be "significant." <u>United States v. Everett</u>, 825 F.2d 658, 660 (2d Cir. 1987) (holding that "the prosecution is not permitted to wholesale proof into evidence under the guise of 'corroboration purposes'"). In this case, the fact Mr. Ahmed knew Moumou is not relevant to any of the charged offenses and is therefore not significant. As to CC-1 and CC-2, and the fact that Mr. Ahmed knew them can be proved by more direct evidence (<u>e.g.</u>, the

recorded telephone calls).  Because the corroboration is not

sufficiently direct, and the matter to be corroborated is not

sufficiently significant, see Everett, 825 F.2d at 660, this

court should not admit CW-1's testimony regarding Mr. Ahmed's

life in 2009 for purposes of corroborating Mr. Ahmed's post-

arrest statements.

Even if this Court concludes that the evidence of Mr.

Ahmed's alleged activities in Western Europe in 2009 has some

slight relevance to the charged offenses, the Court should

exclude this evidence as unduly prejudicial pursuant to Rule

403.  The probative value of this testimony is low, because

there is no direct connection between the evidence and the

charged crimes, and the evidence is remote in time and place.

United States v. Brand, 467 F.3d 179, 197 (2d Cir. 2006)

(holding that the government is required to establish "a

similarity or some connection" to establish that a prior act is

relevant to an element of the charged offense, such as intent).

In addition, much of the evidence involves innocuous

conduct with no direct relationship to any criminal activities.

For example, the fact that CW-1 allegedly observed Mr. Ahmed and

another person "looking at an internet website that contained

survival and camping type equipment such as boots and clothing,

and [Mr. Ahmed] said he wanted to purchase those items," and the

fact that CW-1 observed Mr. Ahmed and another person

"review[ing] a manual that appeared to relate to a GPS device" do not tend to prove any fact relevant to whether Mr. Ahmed was involved in the charged offenses. (See Gov't Mot. at 13.) This evidence is irrelevant to any issue in dispute and is therefore inadmissible. See United States v. Garcia, 291 F.3d 127, 137 (2d Cir. 2002) (holding that even when offered for a proper purpose, "the government must still establish the relevance of the evidence to the issue in dispute").

Finally, the already questionable probative nature of CW-1's testimony is rendered even more questionable because it is uncorroborated by any other witness or documentary evidence.

In contrast to its low (or non-existent) probative value, the testimony is significantly prejudicial. It invites the jury to convict Mr. Ahmed based solely on his association with (and reminisces regarding) individuals who are alleged terrorists, rather than the actual evidence linking him to the specific charged offenses. See United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998) (holding that "mere association with conspirators and suspicious circumstances. . . are insufficient bases for a conspiracy conviction"). There is no evidentiary link between these alleged activities in Western Europe in 2009 and the charged crimes, and, if this evidence is admitted, the jury would be left to speculate as to the connection and invited

to convict Mr. Ahmed because he is a terrorist, not because he is guilty of the crimes charged in the Indictment.

### C. Evidence of Mr. Ahmed's Alleged Activities in Mali Subsequent to the Charged Offenses

The government contends Mr. Ahmed's activities in Mali[2] after he left Somalia is "inextricably intertwined" with evidence regarding the charged offense, "necessary to tell the full story to the jury," and admissible as proof of intent and knowledge. (Gov't Mot. at 23-24, 35-36.) The government is wrong.

The government admits Mr. Ahmed's alleged activities in Mali took place after the conduct alleged in the indictment, that Mr. Ahmed traveled through several other countries before arriving in Mali, that his alleged activities in Mali do not involve the same individuals as Somalia, or the same alleged terrorist organization.

Furthermore, Mr. Ahmed is not alleged to have joined a terrorist organization or sought any training from any organization in Mali; indeed, the evidence is that he declined to join a jihadist group. Nevertheless, the government vainly asserts Mali is somehow "crucial background with respect to his

---

[2] The sole source of evidence of Mr. Ahmed's activities in Mali is his own post-arrest statements which, for the reasons outlined in Mr. Ahmed's pretrial motion to suppress, were coerced and are therefore unreliable and inadmissible.

participation in a [later] conspiracy to support and receive training from al Shabaab. Govt. Mot. at 19.

The full story of the conspiracies alleged in the indictment ends when Mr. Ahmed left Somalia. There is a clear break between the conduct charged in the indictment in Somalia and the activities in Mali. Thus, it cannot be convincingly argued that these acts are "inextricably intertwined" or necessary to "tell the full story to the jury." See, e.g., Kassir, 2009 WL 976821, at *3 (holding that prior acts were not "inextricably intertwined" because the conduct "was not undertaken to conceal or further the charged conduct; in fact, it was not coordinated with the charged conduct in any way").

As for whether Mr. Ahmed's alleged activities in Mali can be admissible as proof of his intent or knowledge, the Second Circuit "has upheld the admission of subsequent act evidence to prove a state of mind only when it so closely paralleled the charged conduct that it was probative regardless of the temporal difference." Curley, 639 F.3d at 61. In this case, the subsequent acts in Mali did not closely parallel the charged conduct and those acts are therefore not probative of Mr. Ahmed's state of mind with respect to the charged offenses. See Edwards, 342 F.3d at 177 (holding that even when intent and knowledge are expected to be at issue, this "does not open the door for the government and give it *carte blanche* to introduce

any prior act of defendant that falls into the same crime category").

Weighed against this (at best) *de minimus* probative value is the evidence's significant prejudicial effect. The evidence tends to show that Mr. Ahmed is a bad person – someone who offers to perform robberies and kidnappings – who should be punished, regardless of whether he actually was involved the charged offenses. See Old Chief, 519 U.S. at 180 (holding that "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he . . . did the bad act now charged" is improper).

Because Mr. Ahmed's statements regarding his activities in Mali are inadmissible, this Court should likewise exclude the code sheets given to him in Mali, which deal only with Mr. Ahmed's conduct in Mali. As the government itself notes, there is no indication that Mr. Ahmed used these code sheets. In fact, the evidence points the other way; Mr. Ahmed declined Bilal's invitation to join his jihadist group (Jamaat Jihadiya). In fact, Mr. Ahmed expressed fear when he heard of Jamaat Jihadiya's violent ways and was concerned for his safety.

The code sheets (and the government is well aware of this fact), bear no relevance to this conspiracy. First, the charged conspiracy involves al Shabaab and Jamaat Jihadiya is in no way connected to al Shabaab. See Gov't. Mot. at 14, fn. 6. Second,

the code sheets could not have been used in the alleged

conspiracy as the conspiracy alleged in this indictment was

complete before Mr. Ahmed was provided with the code sheets.

Third, Mr. Ahmed was "afraid" of Bilal and Jamaat Jihadiya and

tried to "escape" from them. Govt. Mot. at 15. Thus, the code

sheets are not probative of any element of the offense and

should be excluded as irrelevant. This is especially the case

where there is no evidence that these "code sheets" were to be

used or used in furtherance of any charged offenses. To the

contrary, the government's papers state that these code sheets

were offered to Mr. Ahmed by "Bilal" whom Mr. Ahmed did not

consider to be a "good muslim" and therefore declined to accept

their offers.[5] Govt. Mot. at 15. To introduce such convoluted

testimony would serve only to confuse a jury and allow into

trial evidence not probative of any fact in issue. And, the

prejudicial impact of such testimony would be un-erasable.

**D. Evidence of Prior Convictions**

Finally, the government has stated that it seeks to introduce

evidence of two prior convictions from 1994 and 2003 to

establish that Mr. Ahmed's post-arrest statements are reliable

and accurate. (Gov't Mot. at 3.) The government theorizes that

---

[5] The facts here are opposite to those of United States v.
Kassir. In Kassir, the defendant associated (not declined) with
terrorist groups other than al Qaeda. Here Mr. Ahmed was scared
of Bilal, Jamaat Jihadiya and tried to escape their recruitment
of him.

because Mr. Ahmed told the truth about the convictions, his post-arrest statements must therefore have been otherwise truthful as well. The fact that Mr. Ahmed truthfully told interrogators that he was convicted of these two relatively minor crimes, however, proves little, if anything, regarding whether Mr. Ahmed's post-arrest statements are otherwise truthful and trustworthy. See United States v. Irving, 452 F.3d 110, 119 (2d Cir. 2006) (holding that to corroborate an admission, there must be "substantial independent evidence which would tend to establish the trustworthiness of the statement" (quoting Opper v. United States, 348 U.S. 84, 93 (1984)).

Whether or not Mr. Ahmed was truthful about one aspect of his personal background (especially when it is a prior conviction that a law enforcement officer would have an independent record of), is insufficient to establish that any of his other statements in response to interrogation by Nigerian and U.S. officials regarding the substance of the matters at issue are truthful, reliable or accurate, especially given the unique conditions under which they were extracted. The prior convictions are simply not probative of whether the remainder of Mr. Ahmed's statement is truthful or reliable.

Because the evidence the government seeks to introduce does not tend to prove that the material admissions in Mr. Ahmed's post-arrest statements were truthful, the evidence lacks

probative value. The prejudicial effect of these prior convictions certainly outweighs any probative value, and the evidence should therefore be excluded pursuant to Rule 403. See Old Chief, 519 U.S. at 185 (holding that "there can be no question that evidence of the name or nature of the prior offense generally carries a risk of unfair prejudice to the defendant").

## CONCLUSION

For each and every one of the foregoing reasons, the government's in limine motion should be denied.

Dated:      May 25, 2012
            New York, New York

            Respectfully submitted,

            David E. Patton, Esq.
            FEDERAL DEFENDERS OF NEW YORK, INC.

By: _____
Sabrina P. Shroff, Esq.
52 Duane Street, 10th Floor
New York, New York 10007
Tel.:  212-417-8713

            -and-

            The Law Offices of Sean M. Maher, PLLC

By: _____
Sean M. Maher, Esq.
233 Broadway
Suite 801
New York, New York 10007
Tel.:  (212) 661-5333