UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,              :

    - v -                                                         :    10 Cr. 131 (PKC)

MOHAMED IBRAHIM AHMED,                 :

                          Defendant.     :
-------------------------------------------------------X

## Sentencing Memorandum on Behalf of Mohamed Ibrahim Ahmed

                    David E. Patton, Esq.
                    Federal Defenders of New York, Inc.
                    Attorney for Defendant
                      Mohamed Ibrahim Ahmed
                    52 Duane Street - 10th Floor
                    New York, New York 10007
                    Tel.: (212) 417-8700

Sabrina P. Shroff,
 Of Counsel

TO:   Preet Bharara, Esq.
       United States Attorney
       Southern District of New York
       One St. Andrew's Plaza
       New York, New York 10007

       Attn.:  Benjamin Naftalis, ESQ.
               John P. Cronan, ESQ.
               Rachel Kovner, ESQ.
               Assistant United States Attorneys

# PRELIMINARY STATEMENT

This sentencing memorandum is respectfully submitted in support of Mr. Mohamed Ibrahim Ahmed's request for a non-guidelines sentence of five years (60 months) in prison. Mr. Ahmed has pled guilty to one count of conspiring to provide material support to Al-Shabab, and one count of conspiring to receive military-type training from Al-Shabab, a designated foreign terrorist organization, in violation of 18 U.S.C. § 371 and 18 U.S.C. § 3238.

Mr. Ahmed has never engaged in terrorist acts against the United States and never intended to do so. He sought training in order to participate in a military struggle against foreign occupation in his African homeland. His actions do not warrant a sentence of 10 years in prison – a sentence properly reserved for those who support, facilitate, and encourage terrorist acts.[1]

Mr. Ahmed is an Eritrean native who joined Al-Shabab to fight in Somalia against the Ethiopian forces currently supporting one side of a civil war. His support for Al-Shabab was entirely limited to his efforts to get the training and equipment he needed to join the fight in Somalia. Mr. Ahmed never did join that fight; rather, he was arrested in Nigeria, interrogated there, and then flown to the United States (Stewart

---

[1] Indeed, as discussed below (see Argument, Point II), even defendants who wholeheartedly support the goals of Al-Shabab or al Qaeda, and encourage terrorist acts while living in, and enjoying the benefits of, America, have been sentenced to less than the 10 years in prison being sought by the government here. It would be unfair for the Court to impose a higher sentence on Mr. Ahmed, a foreign national who sought only to fight for Eritrea, and did not care about or support Al-Shabab's wider goals or self-declared fight against America.

Airport in White Plains) for prosecution.

Mr. Ahmed bears no animosity towards America or Americans, and no desire to fight or harm Americans. Mr. Ahmed's offense conduct was "begun and committed outside of the jurisdiction of any particular State or district of the United States." PSR ¶ 2 (Count One), ¶ 3 (Count Two). And, his efforts were not directed at the United States, but were solely limited to Africa. His only connection to the United States results from his rendition.

Since his arrest, Mr. Ahmed has realized the error of his ways. He sincerely regrets aligning himself with an organization (Al-Shabab) whose greater goals he rejects, just because he approved of their efforts to fight Ethiopia and their Somali allies. And, to the extent he can, he has tried to make up for his conduct. Thus, Mr. Ahmed has revealed all that he knows about Al-Shabab to the Nigerian and United States authorities, and there is no claim that the information he provided is either incorrect or incomplete. Likewise, he has been a model prisoner, maintaining a clear disciplinary record since his incarceration. For Mr. Ahmed, the fight is over. He poses no threat to society, and will not re-offend.

It is respectfully submitted that the Court should not sentence Mr. Ahmed – a foreign national who never intended to act against the United States, and will never act against the United States – to the maximum sentence of ten years (five years on each count) urged by the government. Rather, the parsimony principle, and the other sentencing considerations and goals underlying 18 U.S.C. 3553(a), are best served by a sentence of five years (60 months) in prison.

# STATEMENT OF FACTS

## Mohamed Ibrahim Ahmed

Mr. Ahmed's entire life has been marked by the Ethiopian-Eritrean conflict. He was born in April 1974, and the bloody Ethiopian civil war broke out just months later, in September 1974. This civil war lasted until 1991, and fully involved Eritrea, as a putative breakaway province of Ethiopia struggling for its own independence since 1961. It was a time of massacres and warlords, and Mr. Ahmed's earliest memories are of firearms, explosions, soldiers and rebels, and of running, hiding, and being evacuated from his home. See PSR ¶ 56. The massacres perpetrated on the Muslim population of Eritrea by the Marxist Deng government of Ethiopia are legendary; more than one village (Basik Dera, Hirgigo, She'eb, and others) had its entire population locked in the village mosque, and the mosque set on fire.

Mohamed's immediate family life was equally fractured as a result of a bitter custody battle between his father and grandmother. He was kidnapped by his father, hidden by his grandmother from his father, and, whenever he lived with his father, Mohamed was abused and beaten by his stepmother. Mohamed became so traumatized by these experiences that, during the court battle over custody, he lost the power to speak or communicate with anyone for several weeks. See PSR ¶ 57.

Eventually, Mohamed joined his mother in Saudi Arabia, but just a few years later, when Mohamed was 12, his mother went blind, and could no longer afford to keep him, or educate him. Desperate, his mother made arrangements for him to immigrate to

Sweden with an uncle he did not know. Although Mohamed immigrated to Sweden with the uncle, Mohamed never lived with him. He was sent to a boarding school instead. See PSR ¶ 58.

As a result of these experiences, Mohamed never formed close bonds with his half-siblings or any member of his family, except for his mother, with whom he remained very close and whom he supported financially. See PSR ¶¶ 55, 59-61. To substitute for the bonds he did not have with his family, Mohamed became an ardent Eritrean nationalist. Unwilling to blame his mother, or even his father, for the many hardships he experienced growing up, Mohamed blamed Ethiopia, the country that had plunged his country, Eritrea, into decades of war and death. Thus, Mr. Ahmed's entire adult life has been devoted to, and shaped by, the political struggle against Ethiopia.

Eritrea won its political independence from Ethiopia in 1991, with the overthrow of the Marxist Deng government in that year. However, relations between the new governments of Ethiopia and Eritrea soon soured as the result of a dispute over borders. Open warfare broke out in 1998 and lasted until 2000, with the military defeat of Eritrea and an internationally-brokered peace treaty. To this day, in violation of that treaty, Ethiopia occupies part of Eritrea. As important, the fight between Eritrea and Ethiopia has always involved the heavy use of proxy forces within each others' countries, and the support of various rebel factions within the neighboring country of Somalia.

Somalia is important because it borders Ethiopia and can be used to flank and pressure Ethiopia. Indeed, in 1977, the then-rebel government of Eritrea utilized a predetermined invasion by Somalia to occupy Ethiopian military resources, while it

almost managed to overthrow the Deng government in a simultaneous, coordinated attack from Eritrean territory. Well-aware of the danger Ethiopia faces if an unfriendly regime takes power again in Somalia, Ethiopia and Ethiopian troops currently support the Transitional Federal Government that represents one side of the Somali civil war. The other side of that civil war includes the fighters of Al-Shabab, who are supported in their struggle by Eritrea. See, e.g., "Q&A: Who's Supporting Al-Shabab?" ("Q&A"), available at Http://www.voanews.com/content/qa-whos-supporting-al-shabab-133240378/159135.html ("no one doubts that Eritrea has throughout the last four years been supportive of al-Shabab, sending in weapons, sending in trainers and also training hundreds of al-Shabab fighters in some of its military camps").

Eritrea's long-standing support of Al-Shabab is not ideological. Rather, Eritrea's support is entirely practical, and meant solely as a means to counter Ethiopia's influence in Somalia and further Eritrea's goal of complete independence. Today, Eritrea still remains partially occupied by Ethiopia. Q&A at id. Mr. Ahmed's support of Al-Shabab also was entirely practical, and never ideological. He knew that Al-Shabab was fighting Ethiopia and supported by his country of Eritrea, and he knew that he wished to fight Ethiopia to help Eritrea. To Mr. Ahmed, any other goals, statements, or threats by Al-Shabab were irrelevant. To him, Al-Shabab was nothing more than a means to a very specific end – a way to help Eritrea's struggle for independence against Ethiopia. The United States, its laws and concerns, never entered Mr. Ahmed's mind.

**Mr. Ahmed's Offense**

In 2009, Mr. Ahmed traveled to Somalia to receive military training so he could

join the fight against Ethiopia. To gain access to that training and an opportunity to fight, Mr. Ahmed paid various persons in Somalia approximately $600 in bribes and other "donations." PSR ¶ 13. He also purchased an AK-47 for $700 as his personal weapon "so I could go to the training camp and learn how to use it and how to defend myself." Id. ¶ 14. The weapon never left Somalia.

Mr. Ahmed never managed to join the fight against Ethiopia, because – tellingly – he was not fully trusted by Al-Shabab. Frustrated by the delays, Mr. Ahmed left Somalia and traveled to Nigeria where he was arrested in November 2009 and held for approximately five months. In Nigeria, Mr. Ahmed provided all the information he had regarding Al-Shabab and his actions to the Nigerian and U.S. authorities (PSR ¶ 13), information that has been fully corroborated as true and complete (id. ¶ 15). Thereafter, he was flown to the United States, where he has remained in continuous custody.

Mr. Ahmed sought training from Al-Shabab to help Eritrea's struggle for freedom from Ethiopian hegemony and occupation. Bluntly put: Mr. Ahmed is not from America, and America and its politics did not concern him.[2] To the extent Mr. Ahmed thinks about Americans, he likes them:

> Ahmed did offer that he has no animosity toward Americans. He

---

[2] In this regard, Mr. Ahmed objects to those portions of the PSR which detail actions and objectives of Al-Shabab which he does not share. See PSR at pp. 6-7, 9-13. The PSR goes so far as to include actions that took place before Al-Shabab was designated a foreign terrorist organization, and actions that Mr. Ahmed did not know occurred (e.g., the attempted mortaring of an American delegation) until he was told about it while in custody. Id. In any event, Mr. Ahmed's statements are clear: he came to Somalia to fight in Somalia against what he viewed to be illegitimate government supported by a country (Ethiopia) occupying and fighting his country (Eritrea). Id. pp.7-9 (¶¶ 11-14). Given this, the government's tactical attempts to paint Mr. Ahmed as being opposed to the United States (something he is not) are unpersuasive.

6

advised that he had friends in the United States and hoped to visit the country some day in the future. He remarked that people in the United States are "funny" and "like life."

PSR ¶ 34.

**<u>The Guidelines Calculation and the Requested Sentence</u>**

With a base level of 26, plus a 12 level increase because the offense involved a federal crime of terrorism, and related adjustments (including acceptance of responsibility), the Total Offense Level in this case is 39. Further, while Mr. Ahmed has no known criminal convictions, because the offense involved a federal crime of terrorism, his criminal history category is raised from Level I to Level VI. This results in an advisory Guidelines Range sentence of 360 months (30 years) to Life. <u>See</u> PSR pp. 4-6. However, the statutory maximum sentence is 120 months (60 months on each count). <u>Id.</u> at p. 6. There is no mandatory minimum sentence, and the Court has the discretion to impose any sentence from probation to 120 months.

The government concedes that, in analyzing the offense, the two counts are to be grouped together "because they involve the same act or transaction." PSR p. 4; <u>accord</u> <u>id.</u> at ¶ 37 ("the counts involve the same victim and the same act or transaction"). Yet, in its Sentencing Recommendation, the government asks that the Court impose a sentence of 60 months on each count, to be served consecutively for a total of 120 months. The defense respectfully disagrees. This offense was indeed one single act, entirely limited to Mr. Ahmed's efforts to join the fight in Somalia. Mr. Ahmed should be punished for that act, and the two counts served concurrently. Accordingly, defense counsel and Mr. Ahmed respectfully request that Mr. Ahmed be sentenced to a total of

60 months (five years) in prison. At the conclusion of his incarceration, Mr. Ahmed will be subject to immediate deportation from the United States.

## ARGUMENT

I.  **THE ADVISORY GUIDELINES RANGE IS UNREASONABLE IN THIS CASE AND DOES NOT ARRIVE AT A RANGE APPROPRIATE TO MR. AHMED**

When it comes to terrorism offenses, the Sentencing Guidelines are a blunt and sometimes unreasonable instrument. In nearly every case, the maximum sentence is far exceeded because of the adjustments required (e.g., the 12 point terrorism enhancement, and the shift to Criminal History Category VI). As a result, the Sentencing Guidelines do not properly distinguish among the many different offenses that technically fall within the statutory definitions of "involving" or "intended to promote" a federal crime of terrorism. To the contrary, by treating all such cases equally, the Guidelines range cannot help but overstate the seriousness of the conduct of individuals like Mr. Ahmed, compared to others who specifically target the United States for attack. Likewise, the enhancements indiscriminately group all individuals convicted of eligible offenses as if they all have the same ideological or criminal history. Here, Mr. Ahmed is not a career criminal, and did not seek to fight with Al-Shabab out of ideological commitment to its cause, but out of a specific desire to help his homeland, Eritrea, in its struggle against Ethiopia.

The Supreme Court's modern sentencing jurisprudence makes clear the Guidelines are strictly advisory. See, e.g., United States v. Booker, 543 U.S. 220, 259 (2005). The Guidelines are only the "starting point and the initial benchmark" for

8

sentencing proceedings. Gall v. United States, 552 U.S. 38, 49 (2007). No "extraordinary" justification is required for the Court to impose a non-Guidelines sentence appropriate to "the nature and circumstances of the offense and the history and characteristics of the defendant." Id. at 49, 50 n.6. Indeed, the Second Circuit has explained that part of this Court's sentencing responsibility is precisely to apply the discretion the terrorism enhancement lacks, and distinguish between and among defendants and their crimes before imposing a sentence under the broadly applicable terrorism enhancement:

> [E]ven with enhancements of magnitude — *i.e.*, those that "sharply increase the recommended sentences" — there still may be "a wide variety of culpability amongst defendants." *Cavera*, 550 F.3d at 192. There may therefore be "different sentences based on the factors identified in § 3553(a)." *Id.* Sattar's crimes are indeed grave; he may well be the most culpable of these defendants. But the district court has a responsibility, *inter ali* similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Perhaps all who merit this enhancement are culpable and dangerous — but some among them are more culpable, more dangerous, with crimes more serious, than others. It is the district court that is primarily charged with the responsibility for making such distinctions.

United States v. Stewart, 590 F.3d 93, 144 (2d Cir. 2009) (affirming the district court's variance, although defendant was convicted of conspiracy to murder); United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003) ("A judge determining that § 3A1.4(b) over-represents the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes <u>always</u> has the discretion under § 4A1.3 to depart downward in sentencing.") (emphasis added); Stewart, 590 F.3d at 154 (Calabresi, J., concurring) ("When a Guidelines recommendation has such dramatic

consequences and yet covers a multitude of sins, unusually broad sentencing discretion in the district court is essential.").

Recently, in United States v. Yusuf, Case No. 10 Cr. 4551 (BTM) (S.D. Cal. Dec. 11, 2012), District Judge Barry Ted Moskowitz sentenced defendant Nima Ali Yusuf to eight years for providing material support to Al-Shabab. As part of his sentencing determination, District Judge Moskowitz recognized that "I can't give the guideline factor too much weight in this 3553 analysis," Yusuf Sentencing Tr. at 54-57. The Court explained:

> The problem is Congress set a range from zero to 15 years, but the guidelines has taken it to 15 years. ... There is nothing less under the guidelines, and so for those reasons I find the guidelines to be unreasonable and not to be a fair exercise of the Sentencing Commission's discretion.

Id. at 30-31; id. at 34 ("the guidelines jump too high and they don't allow the Court's discretion under the statutory scheme, then that's not reasonable"). The Stewart, Meskini, and Yusuf courts are correct. That this is a terrorism-related case requires the Court to exercise more, not less, of its judicial discretion, and give additional weight and scrutiny to Mr. Ahmed, his history, and his motivations.

## II. A NON-GUIDELINES SENTENCE OF FIVE YEARS IS APPROPRIATE IN THIS CASE

Under the parsimony clause of 18 U.S.C. § 3553(a), it is the Court's duty to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth" in § 3553(a)(2).[3] Kimbrough v. United States, 552 U.S. 85, 128

---

[3] 18 U.S.C. § 3553(a) provides, in relevant part:

S.Ct. 558, 570 (2007); United States v. Cavera, 505 F.3d 216 (2d Cir. 2007). Further, the Court may "not presume that a Guidelines sentence is reasonable for any particular defendant"; instead, it must "conduct its own independent review of the § 3553(a) sentencing factors." Cavera, 550 F.3d at 189; see also Nelson v. United States, 555 U.S. 350 (2009). In Mr. Ahmed's case, those factors favor a five year sentence, followed by deportation from the United States.

The facts supporting a five year sentence are simple. Mr. Ahmed is a foreign national who acts are limited to Africa, and whose conduct was never directed at the United States. See Statement of Facts. His entire life has been shadowed by the political struggle between Eritrea and Ethiopia, and Mr. Ahmed's sole aim was to be a part of that struggle. He had no greater aims, and certainly none that encompassed the United States of America.

Mr. Ahmed now recognizes that he was wrong to align himself with a terrorist group, just because they were fighting a common Ethiopian enemy. He is filled with remorse over his actions, and, to the extent he can, he has tried to make up for his

---

(a) The court, in determining the particular sentence to be imposed, shall consider—
    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2) the need for the sentence imposed—
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
                      * * *
    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

conduct by providing information to the authorities and being an exemplary prisoner. See Statement of Facts.

Importantly, Mr. Ahmed will not re-offend. He now understands that his support of Eritrea does not excuse any association with terrorists and he will steer clear of any terrorist or violent organization in the future. He will never turn to, or support, violence again. Under these circumstances, a sentence of five years is sufficient, but not greater than necessary, to punish and rehabilitate Mr. Ahmed, while serving as an appropriate warning to others. Kimbrough, supra; Cavera, supra.

A comparison of this case with Yusuf underscores that five years is the right sentence here. In United States v. Yusuf, supra, defendant Nima Ali Yusuf pled guilty to providing material support to Al-Shabab. Ms. Yusuf was an American citizen from Somalia, who had been granted asylum in the United States, and had taken advantage of all the opportunities and benefits available in this country while living in Minnesota and then California. Ms. Yusuf returned the favor by helping to recruit and encourage other Americans to engage in jihad on behalf of Al-Shabab against the Transitional Federal Government in Somalia. Ms. Yusuf directly funded and encouraged four persons she knew from Minnesota, who had previously left for Somalia, to continue to fight for Al-Shabab, paying them money and monthly stipends, and trying to obtain a laptop and video recorder so they could record statements encouraging others to wage jihad. Yusuf Sentencing Tr. at 6-7, 15. She also tried to convince a U.S. resident in San Diego to go to Somalia and wage jihad for Al-Shabab. Id. at 7. Most of Ms. Yusuf's payments and encouragement went to Abdisalan Hussein Ali, who blew himself up in a suicide attack

after recording an English audiotape encouraging others in America to wage jihad. Sentencing Tr. at 8-10, 60.

Like Mr. Ahmed, Ms Yousef was born in Africa (Somalia) and her young life was marred by warfare, in which both of her parents were shot. Yusuf Sentencing Tr. at 43-44. However, unlike Mohamed Ahmed, Ms. Yusuf was an ardent supporter of all of Al-Shabab's goals, including worldwide jihad and the killing of infidels everywhere. Id. at 54-57.

Despite Ms. Yusuf's whole hearted support for Al-Shabab and efforts to recruit Americans to fight, the Hon. Judge Barry Ted Moscowitz sentenced Ms. Yusuf to eight years in prison, rather than the 15-year maximum or the 10-year sentence advocated by the government. The district court concluded that the guidelines for this offense were unreasonable because the enhancements routinely jump to the maximum statutory sentence even though there is no statutory minimum and the sentences should range all the way down to zero. Id. at 30-32. While the guidelines treat acts with very different ranges of harm as though they were the same, the District Court considered it important that Ms. Yusef's level of support for Al Shabbab was relatively small, amounting to only $1,450. Id. at 65.

Mr. Ahmed's level of support was even smaller than Ms. Yusef's, offering only his personal services, and his support for the organization was limited to its role in the Eritrean-Ethiopian conflict. Further, neither he nor his offer to help Al Shabbab had any connections to the United States or involved any Americans. His actions were not directed at Americans and he did not aim to recruit Americans within the United States

13

nor did he encourage directed violence toward the American people or its interests abroad. Ms. Yusef, on the other hand, devoted her life to it. She encouraged and paid others to encourage them to direct their violence towards us. If Ms. Yusef received an eight-year sentence, then Mr. Ahmed's conduct certainly warrants no more than five years.

Similarly, in <u>United States v. Warsame</u>, 651 F.Supp.2d 978 (D. Minn. 2009), the district court sentenced defendant Warsame, who was convicted of providing material support <u>to al Qaeda,</u> to 92 months imprisonment. Warsame, a resident of Canada and then the United States, traveled to Afghanistan, where he received military training in a camp run by Usama Bin Laden, and attended lectures personally given by Bin Laden. Upon his entry to the Canada and the United States, he continued to communicate with al Qaeda members and supported al Qaeda financially. 651 F.Supp.2d at 979-980.

The Minnesota District Court sentenced Warsame to 7 years and 8 months in prison because it found "nothing that adequately demonstrates that Warsame was a part of a specific plot against the United States, and very little that suggests he was especially useful to al Qaeda." 651 F.Supp.2d at 981. The same conclusions are called for here. There is nothing showing Mr. Ahmed was part of (or would ever have been part of) a plot against the United States, or that he was of any importance to the Al-Shabab. To the contrary, Al-Shabab essentially rejected him.

There is no question that al Qaeda has done far more damage to the United States than Al-Shabab. It is respectfully submitted that, if training with al Qaeda in a camp run by Bin Laden, and continuing to materially support al Qaeda even after the 9-

11 attacks while living in Minnesota, merits less than eight years, then Mr. Ahmed surely merits no more than five years.

### III. THE SEVERE CONDITIONS OF MR. AHMED'S CONFINEMENT IN NIGERIA AND IN THE UNITED STATES ALSO SUPPORT IMPOSITION OF THE REQUESTED FIVE YEAR SENTENCE

Before he was taken into the custody of the United States, Mr. Ahmed was detained and held in custody in Nigeria for approximately five months. Conditions of incarceration in Nigeria are deplorable, with overcrowding, lack of food, and inadequate sanitation creating conditions Amnesty International has termed simply "unlivable." See Http://www.amnestyusa.org/our-work/cases/nigeria-patrick-okoroafor; see also "Prison Conditions in Nigeria – Urgent Reform Needed" ("in Nigeria, prisons are death traps"), available at Http://www.africaw.com/prison-conditions-in-nigeria-urgent-reform-needed. Aside from the conditions in the prison, Mr. Ahmed was held for days in makeshift prisons; cuffed to a chair on which he slept and went without food for days on end. He suffered from a hernia for months and it was only when he got to the MCC that he was taken to a hospital for a hernia operation.

The Court also should consider the difficult conditions Ahmed faces while incarcerated in the United States. He has been subject to severe administrative restrictions while in the United States prison system; has no family that will be able to visit him during the term of his incarceration; and is primarily Arabic-speaking (PSR ¶ 54). These conditions make his time in prison significantly more onerous than the conditions faced by the ordinary pretrial detainee or inmate. The very difficult conditions experienced by Mr. Ahmed while held in Nigeria and in the United States is

15

properly considered in the § 3553(a) calculus, see Stewart, supra; Warsame, supra, and provides additional grounds for the requested five year sentence.

## CONCLUSION

For each and every one of the foregoing reasons, a sentence of 60 months (five years) in prison, followed by immediate deportation from the United States is a sentence appropriate to Mr. Ahmed and his particular circumstances.

Dated: March 11, 2013
      New York, New York

                Respectfully submitted,

                /s/
                Sabrina P. Shroff, Esq.
                Assistant Federal Defender
                52 Duane Street
                New York, New York 10007

        & 

                Sean M. Maher , Esq.
                233 Broadway, Suite 801
                New York, New York 10279

                Attorneys for Mohamed I. Ahmed