UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA    :

    - v. -    :    S2 10 Cr. 131 (PKC)

MOHAMED IBRAHIM AHMED,    :

        Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM


                **PREET BHARARA**
                **United States Attorney for the**
                **Southern District of New York**
                **Attorney for the United States**
                      **of America**

**BENJAMIN NAFTALIS**
**JOHN P. CRONAN**
**RACHEL P. KOVNER**
**Assistant United States Attorneys**
    - Of Counsel -



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 12, 2013

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    <u>United States</u> v. <u>Mohamed Ibrahim Ahmed</u>,
              S2 10 Cr. 131 (PKC)

Dear Judge Castel:

      The Government respectfully submits this letter in connection with the sentencing of the defendant, Mohamed Ibrahim Ahmed, a/k/a "Talha," which is scheduled for March 19, 2013. Given the seriousness of this offense, the history and characteristics of this recidivist defendant, the need for the sentence to create adequate deterrence to international terrorists, and the stipulated, advisory Guidelines range of 360 months' to lifetime imprisonment, the Government believes that a Guidelines Sentence (in light of the statutory maximums) of 120 months' is appropriate and necessary in this case. Probation also recommends a sentence of 120 months' imprisonment.

## Background

### I.    Background on Al Shabaab

      As alleged in Indictment S1 10 Cr. 131 (PKC) (the "Indictment"), al Shabaab was at all times relevant to the charged offenses a designated Foreign Terrorist Organization. That designation, imposed on February 26, 2008, was based on al Shabaab's use of intimidation and violence to undermine the Somali government. Prior to designation, in early 2006, al Shabaab assisted other Islamic insurgents in the fight against Somalia's Transitional Federal Government ("TFG"), driving it out of Mogadishu and into Baidoa (Ind. ¶ 1), and provided a safe haven in that vicinity for al Qaeda operatives wanted for the 1998 bombings of the United States embassies in Kenya and Tanzania. (Ind. ¶ 1). After the TFG was re-established in Mogadishu, al Shabaab waged war against it, targeting police stations, government facilities, civilians and the Ethiopian and African Union forces supporting the TFG, capturing towns and cities in southern Somalia, and parts of Mogadishu itself. (Ind. ¶ 2). Throughout 2008, al Shabaab has used

targeted assassinations of civilians and journalists, improvised explosive devices, rockets and automatic weapons to undermine the Somali government and force the withdrawal of foreign troops. (Ind. ¶ 3). As al Shabaab acknowledged shortly after designation, in an April 2008 declaration, one of its goals was to "attack" and "fight . . . as insects and wolves" the Ethiopians, Ugandans and Burundians supporting the TFG. (Ind. ¶ 6). Al Shabaab recognized that those forces, and the TFG, were supported by the United States Government, asserting "America: the wager that you made on [them] in Somalia was a failure and history has proven it." (Ind. ¶ 6).

At least from in or around 2008, al Shabaab has made public statements declaring its intention to assist and strengthen other terrorist organizations that threaten the United States, explicitly stated its intention to harm the United States, and acted on that threat by launching a mortar attack against a U.S. Congressman visiting Somalia and taking credit for that attack:

- Declaring, on or about April 5, 2008: "To the other mujahideen included in the American terrorist list: O' mujahideen brothers! . . . May you be successful in your jihad and may you frustrate the enemies. May Allah help you . . . . Please know, our beloved ones, that we are going through a crucial stage, in which the oppressors have crossed the line. That is why we call upon you to round up and join forces under one leadership and a uniform flag in order to frustrate the enemies of Allah and execute his command. . . . As a result, our jihad will be stronger and more harmful to our enemies." (Ind. ¶ 6);

- Declaring, in or about May 2008, that the mujahideen would "hunt the U.S. government" and that governments supporting the United States and Ethiopia should keep their citizens out of Somalia, after an al Shabaab member was killed by United States missile attacks. (Ind. ¶ 6); and

- Declaring, in or about April 2009, that al Shabaab was responsible for mortar attacks against a United States Congressman who had been visiting Somalia. (Ind. ¶ 6).

## II. Procedural and Factual History

As set forth in greater detail below, in 2009 the defendant left his long-time home in Sweden in order to seek out terrorist training. In early 2009, the defendant traveled to Kismayo, Somalia, for purposes of receiving "jihad" training at an al Shabaab paramilitary camp and later that month traveled to Barawa, Somalia, for the same purpose. While residing in those locations, the defendant provided a total of 3,000 Euros to al Shabaab. In Baraawe, the defendant received training and instructions on bomb-making and bomb-detonation, including specific

directions relating to the preparation and assembly of certain compounds and the use of bomb fuses, and purchased an AK-47 assault rifle, which he later provided to an al Shabaab commander upon his departure from Somalia. Thereafter, the defendant traveled to Mali, in further search of terrorist training. In November 2009, the defendant traveled to Nigeria, where he was arrested and subsequently gave multiple confessions to Nigerian and U.S. authorities, between November 20, 2009 and March 1, 2010, while being detained by Nigerian authorities.

On February 26, 2010, the defendant was arrested by Nigerian Interpol officers, pursuant to an Interpol Red Notice that was based on an arrest warrant issued out of this District. On March 6, 2010, United States law enforcement agents took custody of the defendant, pursuant to an expulsion order from the Nigerian Government. He was later flown from Nigeria to Stewart Airport in the Southern District of New York for prosecution.

  A. **The Defendant's Admissions to the FBI and Nigerian Authorities Related to His Material Support of, and Military-Type Training from, al Shabaab in Somalia**

In a series of <u>Mirandized</u> interviews in January and February 2010, the defendant admitted to FBI agents that in late 2008 he decided he wanted to "make jihad." In January 2009, he left Sweden and traveled to Somalia to train and fight with al Shabaab. After arriving in Somalia via Iran, the defendant resided for about six weeks (in total) at two al Shabaab "immigrant" houses in Kismaayo and Baraawe. These houses are residences for jihadists awaiting transfer to al Shabaab military training camps. (According to the defendant, an Islamist cleric ("CC-1") previously based in Sweden and subsequently based in Somalia encouraged the defendant to travel to Somalia to engage in jihad. This cleric also provided a telephone reference for the defendant so that the defendant could reside at the Kismaayo house in advance of his training in deadly terrorist tactics.)

Further, the defendant admitted to the FBI that, during the six weeks he spent at the al Shabaab houses, the defendant received bomb-making instructions from an al Shabaab explosives expert, and obtained from this explosives expert written instructions containing, among other things, formulas for making explosives and bomb-use schematics. The defendant also admitted that he purchased an AK-47 rifle, two grenades, an operator vest, and additional magazines while in Baraawe, to be used in future training and fighting for al Shabaab. The defendant further stated that, when he departed Somalia, he left the AK-47 behind. The defendant also admitted to donating 3,000 Euros to al Shabaab while in Somalia, given in two installments to the managers of the immigrant houses where the defendant stayed.

In addition to his confessions to the FBI, the defendant gave detailed, written and oral confessions to the Nigerian State Security Service (the "SSS") and the Nigerian Police

following his arrest. Each of these confessions closely mirror the defendant's admissions to the FBI and speak to the defendant's purposeful provision of material support to al Shabaab and his receipt of terrorist and explosive training. For example, in his November 25, 2009 written statement to the Nigerian SSS, the defendant admitted to traveling to Somalia in order to attend an al Shabaab terrorist training camp, donating money to al Shabaab, and purchasing the AK-47 assault rifle:

> I pay Mohamed 200 dollar and one hundred to the other guy when I come to city of Lepol[.] I take a car to cross the border to Somalia a city call Doblen I told to the driver take me to Shabab [i.e., al Shabaab]. He took me to another group call the self Rascamponi. They ask me to join them. I say am here to meet Sheik Fouad [i.e., a radical al Shabaab cleric]. They told me you have to go to city of Kismayo. Then I take mini bus to Kismayo. One soldier of Shabab [i.e., al Shabaab] he was with us. He takes me to one of Shabab's spokesman in Kismayo. His name is Hassan Jacob. I told him I know Sheik Fouad. Then he called Sheik Fouad. He let me to speak to him. He told him yes I know him. After that they take me to house of muhajiren [i.e., the muhajadin, namely, al Shabaab]. So I been waiting 3 weeks in the house [i.e., guest house] there. I told them I want to go to the training camp. They told me we all going to the city of Brawa, from there you will go to the training camp. Of course they take all my document and my laptop and my mobile. They ask me as well what I was doing before I come. I told them I was working. When we come to city of Barawa, they kept me in the house. They say you are going tomorrow. After tomorrow I donate to them 300 as well I was buying AK 47 for 700 dollar.

In his statement to the Nigerian police in February 2010, the defendant confirmed much of the same:

> I secretly went to Turkey without anyone knowing about me. When I entered Somalia I went to 'al Shabab' house. My intent is to go to the training camp so I can be ready for anything; and I could defend myself and help the 'shabab' if need be. Nonetheless, I had a disagreement with them because they had me stay in the house and they did not send me to the training camp. I stayed in the house for one and half month; thereafter, I decided to return to Kenya. At the beginning, I had bought in Somalia a Kalashnikov [i.e., an AK-47] for 700 dollar. I did that; so I could go to the training camp and learn on how to use it and how to defend myself. When I was at 'al shabab' house, there were books about explosives. I asked someone on how to do this? Aren't they dangerous? He told me that it's a simple matter; it's like we prepare the food. He wrote for me the [illegible] on a

    piece of paper and gave it to me [i.e., the explosives instructions that the defendant had in his possession upon his arrest].

  **B.**  **Physical Evidence Seized from the Defendant Corroborates His Confessions**

    Evidence seized from the defendant upon his arrest in Nigeria and from a location where the defendant was residing at the time of his arrest — including the explosives schematic and bomb-making "recipes" and instructions — corroborates the defendant's statements to Nigerian authorities (in late 2009) and his Mirandized statements to the FBI (in early 2010) regarding the support he provided to, and the military-type training he received from, al Shabaab. Similarly, the stamps in the defendant's passport are consistent with the defendant's description of his decision to abandon his home in Sweden, and then travel to Africa via Iran in order to wage deadly jihad. Lastly, an al Qaeda training manual was seized from the defendant in Nigeria, which contains a verbatim, consecutive collection of articles written by Abdelaziz al-Muqrin (a deceased Saudi Arabian al Qaeda commander) and published in an al Qaeda manual series.

  **C.**  **The Defendant's Admissions Regarding al Shabaab's Goals**

    During his interviews, the defendant acknowledged that he knew that al Shabaab's goals were not limited to its activities in Somalia, but included, among other goals, causing harm to the United States. For example, the defendant admitted:

- he knew that al Shabaab fights the United States (to the extent that the United States is in Somalia), he believed that the United States was wrong for its military action in Somalia, and he realized that al Shabaab and the United States are not friends and could be seen as enemies;

- while in an al Shabaab guest house, he viewed video footage (on an al Shabaab supplied laptop) of Usama Bin Laden ("UBL") praising al Shabaab and presenting the United States in a negative light. The defendant stated that "he was comfortable with UBL's praise of al Shabaab because UBL was a Muslim speaking about Muslims," and noted that "al Shabaab did not object to UBL's praise and considered it 'good'";

- he was not aware that the aircraft of an American Congressional delegation was fired upon-by al Shabaab, but stated that the U.S. Congressman was supporting a "criminal" and "illegitimate" government and therefore his aircraft was a legitimate target of al Shabaab; and

- "the United States are not 'angels.'" Further, the defendant posed the following rhetorical questions: "how many bombs did the United States drop and how many people did the United States kill. . . . [The United States] are not innocent."

### D. The Defendant's Admissions Regarding Other al Shabaab Associates and Sweden-based Extremists, Whom the Defendant Called While in Africa

During his <u>Mirandized</u> interviews, the defendant confirmed his association with a number of well-known al Shabaab leaders and associates, as well as other extremists. The defendant also acknowledged that he attended mosques in Stockholm that are known centers of extremist activities.

These individuals include the Islamic cleric (CC-1) who is described above, as well as Mohamed Moumou, whom the defendant stated he last saw in 2001 or 2002. Moumou, who is now deceased, was a well-known al Qaeda associate who attended Khalden, a terrorist training camp in Afghanistan, in the late 1990s. The defendant admitted that in the mid-1990s he became partners with Moumou in certain credit card fraud operations. The defendant stated that he last saw Moumou in 2001 or 2002. The defendant further explained that he continued to be involved in credit card fraud from 2001 through 2003, when he was living in Germany, and was arrested in Stuttgart, Germany in 2003 and spent over a year in a German prison. The defendant also said that in 1995 he was imprisoned in Sweden for bank robbery. The defendant's statements about his criminal history are corroborated by (1) records that the Government has obtained from German authorities and produced to the defense that reflect that in March 2004, in the Stuttgart District Court, the defendant was convicted of forgery of "payment cards" in conjunction with falsification of official certifications and fraud, and (2) records that the Government has obtained from Swedish authorities and produced to the defense that reflect that in August 1994 the defendant was convicted of the crime of robbery.

Furthermore, in March and November 2009, the defendant was intercepted speaking to two of his co-conspirators (referred herein as "CC-2" and "CC-3") in Sweden about his whereabouts in Africa and his goal of martyrdom. For example, in March 2009, in a call with CC-3, the defendant described his location in coded language, stating that he is "inside, southern town". (Kismaayo and Baraawe are both in the southern part of Somalia.) CC-3 stated that he had not known where the defendant was, and stated that another individual — likely a reference to CC-2 — had asked about the defendant's whereabouts. CC-3 asked the defendant if he needed "money or anything else." The defendant said he did not, and then stated "I may be getting married," a term that is typically used to refer to engaging in jihad or martyrdom activities. CC-3 responded, "I promise by God you'll make me happy," and later said, "I pray to God that he will

facilitate your matters." Near the end of the call, the defendant said, "I ask God that he'll keep you . . . and everything that you wish for he'll facilitate." Then responded, "For us all."

In two other intercepted calls with CC-2 in November 2009, CC-2 tasked the defendant with obtaining information about a person CC-2 believed to be in Mauritania, Tayeb Oueld Salek. CC-2 indicated that Salek was in prison and that CC-2 and Salek had lost touch. CC-2 asked the defendant to put CC-2 in touch with Salek and to provide CC-2 with news about Salek. At trial, the Government would have offered testimony from an expert in international terrorism that Salek participated in a 2005 attack on military barracks in Mauritania launched by the Algerian Salafist Group for Prayer and Combat (an organization that became the designated foreign terrorist organization Al-Qaeda in the Islamic Maghreb, or AQIM). In July 2009, Salek was imprisoned in Mauritania for recruiting fighters and terrorist financing.

E.   **Information from Cooperating Witness-1**

Based on information provided by a cooperating witness ("CW-1"), the defendant attended at a terrorist training camp in the late 1990s. In particular, during the late 1990s, the defendant and CW-1 both attended the notorious Khalden terrorist training camp in Afghanistan ("Khalden"),[1] where they overlapped for a period of several days. The defendant arrived at Khalden when CW-1 had been there for some time. CW-1 observed the defendant in the company of Ibn Shaykh al-Liby, the manager of Khalden, during the defendant's time there. According to CW-1, it was uncommon for typical trainees to spend time with al-Liby, given his high-level position in Khalden. CW-1 also observed that the defendant spent a significant amount of his time at Khalden with Moumou and with CC-3, whom the defendant already knew when he arrived at the camp.

CW-1 next saw the defendant in early 2009, when CW-1 encountered the defendant at CC-3's home in Western Europe. CC-3 was at that time a leader of a group of about thirty or forty North Africans who, among other things, held meetings to strategize about fund-raising activities on behalf of al Qaeda and to discuss their support for missions of al Qaeda and al Shabaab. CC-3 introduced the defendant to CW-1 as a "brother," and CW-1 and the defendant immediately recognized each other from their time at Khalden. The defendant called CW-1 by the alias that CW-1 had used at Khalden and reminisced with CW-1 about their time there. The

---

[1]   The Khalden camp provided general combat and paramilitary training, and arms training, including with respect to the use of rocket propelled grenades, explosives and land mines. The training included religious instruction and discussions about the importance of removing non-Muslims from the Arabian Peninsula. An individual known as Abu Abdallah al Muhajir gave lectures at Khalden on a variety of topics including how to distinguish believers from non-believers, and CW-1 observed that the defendant attended those lectures.

defendant also discussed with CW-1 another individual, Moumou (now deceased), who had attended Khalden during the same time. The defendant explained to CW-1 that, in the 1990s, the defendant had engaged in credit card fraud with Moumou. CW-1 is aware that, in the 1990s, Moumou engaged in this activity to raise money to support jihad training camps in Afghanistan.

Also in early 2009, CW-1 saw the defendant at the home of another member of CC-3's organization ("CC-4"), in Western Europe. The defendant and CC-4 were looking at an internet website that contained survival and camping-type equipment such as boots and clothing, and the defendant said he wanted to purchase those items. CW-1 also recalled that CC-4 and the defendant reviewed a manual that appeared to relate to a GPS device. CW-1 observed the defendant in possession of a credit card bearing the defendant's name, "Mohammed Ibrahim".

### F. Information from Cooperating Witness-2

Information provided by another cooperating witness ("CW-2"), a former al Shabaab military commander who met the defendant in 2009 in Baraawe, Somalia, shed additional light on the defendant's activities after departing the Baraawe safe-house. CW-2 first encountered the defendant at a police station in Baraawe, Somalia, and saw the defendant wearing a military-style vest with pouches and carrying an AK-47. The defendant had four ammunition magazines, one in the AK-47 and the other three in the vest pouches. Further, CW-2, the defendant, an individual accompanying the defendant, and CW-2's group of fighters traveled together by military convoy to a location approximately fifty miles outside of Kismaayo, Somalia.

CW-2 and the defendant traveled in separate vehicles, but spoke during a stop that occurred when one vehicle became disabled. The defendant told CW-2 that he was from Eritrea and had European citizenship. The defendant said that he had been in Somalia for a few months and had come to Somalia to fight, by which CW-2 understood the defendant to mean to engage in jihad. The defendant further stated that he had already received training outside Somalia and that he wanted to fight in Mogadishu, but that al Shabaab did not trust him and had been keeping him in Baraawe. The defendant advised that al Shabaab maintained strict rules about training camps, and required newcomers to attend such camps regardless whether they had prior training, something CW-2 confirms. The defendant explained that he did not want to attend a training camp because he had already received training elsewhere. The defendant also told CW-2 that he had been to Afghanistan; and CW-2 suspected that the defendant had previously received training in Afghanistan.

The defendant further informed CW-2 that he knew CC-1, the Islamic cleric referred to above, but that the cleric did not help the defendant while he was in Somalia. The defendant also said that he wanted to leave Somalia and travel to Afghanistan via Iran.

After the convoy arrived in Kismaayo, the defendant gave his loaded AK-47 and four magazines to CW-2, and asked CW-2 to give them to one of his al Shabaab fighters. The defendant explained to CW-2 that he bought the AK-47 after arriving in Baraawe.

### G. The Defendant's Admissions & Physical Evidence Related to his Travel to Mali in 2009

During his <u>Mirandized</u> interviews and statements to Nigerian authorities, the defendant also discussed his activities <u>after</u> he departed Somalia in 2009 (and prior to traveling to Nigeria, where he was apprehended). Specifically, the defendant stated that he traveled from Somalia to several countries, ultimately arriving in Mali, where he was directed to the Malian town of Gawa to receive jihadist training. The defendant stated that, in Gawa, he met a man who went by the name "Bilal," and that he (the defendant) subsequently met with Bilal in Halil, Mali. According to the defendant, Bilal asked him to join Bilal's jihadist group, called Jamaat Jihadiya,[2] but the defendant perceived the group to be too violent. The defendant stated that instead he offered to perform kidnapings and robberies for Bilal in Gawa. The defendant further stated that Bilal provided him with a cipher code sheet and country code sheet. While the defendant denied ever using these code sheets, and denied having engaged in actual kidnapings and robberies for Bilal, the purpose of these code sheets was to allow the defendant to covertly communicate with Bilal.

Both the cipher code sheet and the country code sheet that the defendant received from Bilal were recovered from the defendant at the time of his arrest. The cipher code sheet converts roughly one hundred words and phrases to a unique number, including words that appear related to violence or terrorism, such as battle, ambush, airplane, smuggle, soldier, and agent. The cipher code sheet additionally lists a number of countries, including Jordan, Syria, al-Maghrib, Western Sahara, Niger, Chad, Mali, Somalia, Ethiopia, Afghanistan, Pakistan, and Chechnya.

The country code sheet, which is different from the aforementioned cipher code sheet, converts country names into other words. For instance, included on this country code sheet is "Lybia," which purportedly is a coded reference for "America." The defendant explained in his <u>Mirandized</u> interviews that the purpose of this country code sheet was to disguise his communications via telephone related to future kidnapings. The defendant further stated that this country code sheet was incomplete, as Bilal explained to the defendant that Bilal wanted to expand the list to include other targets, such as Canadians.

---

[2] The Government does not believe that Bilal's jihadist organization in Mali, Jamaat Jihadiya, was al Shabaab.

### III. The Superseding Information, Guilty Plea, and Presentence Investigation Report

#### A. The Superseding Information and Guilty Plea

On June 13, 2012, the defendant pleaded guilty pursuant to a written plea agreement to a two-count Superseding Information S2 10 Cr. 131 (PKC) (the "Superseding Information"). Count One charged the defendant with conspiracy to provide material support to a foreign terrorist organization (namely, al Shabaab), in violation of Title 18, United States Code, Section 371, and carries a maximum term of imprisonment of five years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571 of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment. Count Two charges the defendant with conspiracy to receive military-type training from a foreign terrorist organization (namely, al Shabaab), in violation of Title 18, United States Code, Section 371, and carries a maximum term of imprisonment of five years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571 of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment.

Under the plea agreement, the defendant stipulated to the following calculations under the United States Sentencing Guidelines:

**Offense Level**

1. The Guidelines in effect as of November 1, 2011, apply in this case.

2. Pursuant to U.S.S.G. § 3D1.2(a), Counts One and Two are grouped together into a single group, because they involve the same act or transaction.

3. Because the offenses charged in Counts One and Two of the Information are conspiracies, the base offense levels are based on the Guideline for the substantive offense, plus any adjustment from such Guideline for any intended offense conduct that can be established with reasonable certainty pursuant to U.S.S.G. § 2X1.1(a).

4. The Guideline applicable to the offenses charged in Counts One and Two of the Information is U.S.S.G. § 2M5.3. Pursuant to U.S.S.G. § 2M5.3(a), the base offense level is 26.

       5.      Because the offenses charged in Counts One and Two involved the provision of firearms and funds, or other material support or resources with the intent, knowledge, or reason to believe that they were to be used to commit or assist in the commission of a violent act, 2 levels are added pursuant to U.S.S.G. § 2M5.3(b).

       6.      Because the offenses charged in Counts One and Two were felonies that involved and were intended to promote, federal crimes of terrorism, 12 levels are added pursuant to U.S.S.G. § 3A1.4(a).

       7.      Because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense and related to the defendant's offense of conviction and any relevant conduct, 2 levels are added pursuant to U.S.S.G. § 3C1.1.

       8.      Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, an additional one-level reduction is warranted, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

      In accordance with the above, the applicable Guidelines offense level is 39.

### Criminal History Category

      While the defendant has serious criminal convictions outside the United States, the defendant has no prior criminal convictions in the United States. However, because the offenses charged in Counts One and Two of the Information were felonies that involved and were intended to promote, federal crimes of terrorism, the defendant's Criminal History Category is VI, pursuant to U.S.S.G. § 3A1.4(b).

### Sentencing Range

      Based upon the calculations set forth above, the applicable Guidelines range is 360 months to life. However, because the combined statutory maximum sentence for both counts charged in the Information is 120 months' imprisonment, the applicable Guidelines sentence is 120 months (the "Stipulated Guidelines Sentence"). In addition, after determining the

defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 39, the applicable fine range is $25,000 to $250,000.

### B. The Presentence Investigation Report

On February 27, 2013, the Probation Office issued its Presentence Investigation Report ("PSR"). The PSR adopted the above-stated, stipulated Guidelines analysis and recommends a sentence of 120 months' imprisonment. (PSR, Sentencing Recommendation at 24).

## IV. The Defendant's Prior Criminal Record

As set forth above and detailed by Probation, the Government is aware of several of the defendant's prior criminal convictions:

- In 2003, in Stuttgart, Germany, the defendant was arrested and later convicted for forgery of "payment cards" in conjunction with falsification of official certifications and fraud;

- In 2003, in Tubingen, Germany, the defendant was again convicted in conjunction with the use of false documents and fraud; and

- In August 1994, in Sweden, the defendant was convicted and imprisoned for bank robbery and imprisoned.

## Discussion

### I. Applicable Legal Principles

Under current law, sentencing courts must engage in a three-step sentencing procedure. See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). First, the district court must determine the applicable sentencing range, and, in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." Id. at 112. Second, the district court must consider whether a departure from that Guidelines range is appropriate. Id. Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. Id. at 113.

Although the Guidelines are no longer mandatory, district courts must continue to "consult" the Guidelines and "take them into account" when sentencing. United States v. Booker, 543 U.S. 220, 264 (2005); accord United States v. Cavera, 550 F.3d 180, 187 (2d Cir. 2008) ("In [Booker], the Court retained an important role for the Sentencing Commission, leaving untouched the statutory direction to district courts that they should consult the Guidelines range when imposing sentence.") (citing Booker, 543 U.S. at 245-46). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall v. United States, 552 U.S. 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings, id. at 49, and must "remain cognizant of them throughout the sentencing process," id. at 50 n.6. It also is the Court's duty to form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant," and to then impose a sentence "sufficient, but not greater than necessary," to accomplish the objectives of criminal sentencing. 18 U.S.C. § 3553(a); see United States v. Cavera, 500 F.3d at 188 ("In addition to taking into account the Guidelines range, the district court must form its own view of 'the nature and circumstances of the offense and the history and characteristics of the defendant.'") (in banc).

## II. The Stipulated Guidelines Range

While the defendant has stipulated to the applicability of the below-stated Guidelines Calculation, the Government restates the factual basis of some of the enhancements.

Two-level Enhancement Under U.S.S.G. § 2M5.3(b): The defendant's provision of material support to al Shabaab and receipt of military-type training from al Shabaab, included (among other things) his use, carrying, and possession of an AK-47 assault rifle. Specifically, the defendant admitted to both the Nigerian SSS and the FBI that he acquired, among other things, an AK-47 assault rifle and matching magazines in Somalia. In addition, the defendant later provided the AK-47 assault rifle and several loaded magazines to CW-2 for use by al Shabaab fighters.

Twelve-level Enhancement Under U.S.S.G. § 3A1.4(a): Here, the "terrorism enhancement" under U.S.S.G. § 3A1.4(a) is clearly applicable.[3] In United States v. Awan, 607

---

[3] Application Note 1 to § 3A1.4 provides that the term "federal crime of terrorism" is defined by "the meaning given that term in 18 U.S.C. § 2332b(g)(5)," which provides a two-part definition. First, a federal crime of terrorism is an "offense that . . . is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Second, the offense must be a violation of a specific federal criminal statute listed in 18 U.S.C. § 2332b(g)(5)(B). The list includes, inter alia,

F.3d 306 (2d Cir. 2010), the Second Circuit made clear that, to qualify for the terrorism enhancement, the law requires a showing only of a specific intent "to commit an offense that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Id. at 317 (emphasis added). The defendant's "motive is simply not relevant." Id. The relevant question is only whether the defendant knew that the offense was so calculated:

> If the evidence showed that Awan engaged in criminal conduct with knowledge that confederates solicited his actions to effectuate politically motivated bombings in India, or homicidal attacks on that country's security forces or its political leaders, such proof could demonstrate that Awan's crimes were calculated to influence the conduct of government even if he was not personally motivated by that object.

Id. at 317-18. Here, as the defendant has acknowledged, al Shabaab itself has repeatedly undertaken acts to influence and affect the conduct of the Governments in Somalia and abroad, through intimidation, coercion and other terrorist acts.

Two-Level Enhancement Under U.S.S.G. § 3C11.1: The defendant's offense level should be increased by two levels – as stipulated to by the defendant in his plea agreement – because he obstructed justice in submitting a false affidavit to support his suppression motion. See U.S.S.G. § 3C1.1, app. note 4 (listing providing materially false information to a judge as an example of covered conduct). Here, the defendant moved to suppress his post-arrest statements both to Nigerian and U.S. authorities, and with his suppression motion submitted an affidavit under "penalty of perjury" that contained knowingly false statements, including allegations of purported abuse, purported inability to comprehend English, and the alleged failure to be Mirandized.

The Government agrees with the Probation Office's analysis, as stipulated to by the parties, with respect to the applicable Guidelines range for the defendant. Specifically, the Government agrees that, pursuant to United States Sentencing Guidelines ("U.S.S.G.") both counts are grouped together into a single group. (PSR ¶ 27). The Government also agrees that the combined offense level for the group containing Counts One and Two is 42. (PSR ¶¶ 37, 78-80). Because the defendant accepted responsibility by pleading guilty prior to trial and provided timely notification of his intention to plead guilty, the offense level is decreased by 3 levels under U.S.S.G. §§ 3E1.1(a) and 3E1.1(b). (PSR ¶ 44, 78-80).

---

violations of "[18 U.S.C. § ]956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad)" and "[18 U.S.C. § ]2339A (relating to providing material support to terrorists)." Id. § 2332b(g)(5)(B)(i).

Based on the foregoing, the Government agrees that the defendant's applicable Guidelines offense level is 39. (PSR ¶¶ 47, 78-80). Because the terrorism enhancement in U.S.S.G. § 3A1.4 applies, pursuant to U.S.S.G. § 3A1.4(b), the defendant's Criminal History Category is Category VI. (PSR ¶ 79). Accordingly, based on a Guidelines' offense level of 39, and a Criminal History Category of VI, the resulting Guidelines range is 360 months' to life imprisonment. However, because the statutorily required maximum term of imprisonment under both Count One and Count Two is five years' imprisonment, a Guidelines Sentence of 120 months' imprisonment results. (PSR ¶ 79).

### III. The 18 U.S.C. § 3553(a) Factors And The Appropriate Sentence

The Government respectfully submits that a Guidelines Sentence of 120 months' imprisonment is the appropriate sentence in this case. The defendant's long journey from Sweden to Africa – the goal of which was only to learn how to support al Shabaab, and to obtain the requisite military training to fight on its behalf, including training in the use of explosives – can only be described as utterly reprehensible and extraordinarily serious. The defendant sought out a U.S. designated terrorist organization whose objectives included violent attacks not only against the United States but innocent civilians elsewhere. Simply setting out to join al Shabaab required extraordinary dedication. The defendant left behind his life in Sweden, traveling first to Turkey and then on to multiple countries in Africa – Somalia, Nigeria and Mali – for jihadi training and activities. And the training that the defendant received made clear that he was dedicated to the group's violent aims, as he obtained training in explosives of sufficient importance to him that he kept with him written bomb-making instructions and schematics even when he was arrested months later. Had the defendant's goals of being fully trained played out as the defendant had so carefully planned, the lives of numerous others would likely have been lost and countless others would have been forever traumatized.

Far from providing an explanation for this serious criminal activity, the defendant's history and characteristics militate in favor of the maximum available sentence, by establishing a extraordinary need for individual deterrence and to protect the public. Extraordinarily, the defendant's travels to Africa to obtain terrorist training from al Shabaab were the *second* time that the defendant left his home to obtain training in terrorism, as the defendant also studied at the infamous training camp in Khalden, Afghanistan. This conduct is also not the defendant's first involvement in criminal activity; the defendant has several prior criminal convictions in Sweden for the serious offenses of robbery and fraud. These circumstances suggest an unusual need to protect the public from the defendant and to provide specific deterrence.

Finally, the defendant's relatively advantaged circumstances prior to leaving his home are aggravating rather than mitigating circumstances. Before leaving Sweden on a quest to

receive terrorist training, the defendant was not living a life of privation, but had rather obtained legal citizenship in Sweden; had resided in the country for many years; and had gainful employment. Notwithstanding the opportunities afforded to him in Sweden, the defendant knowingly and deliberately chose a different path that celebrated conflict and death.

Nor do the defendant's other claims justify a sentence of less than 120 months for his extraordinarily serious crimes. The defendant claims, in particular, that "[h]e sought training in order to participate in a military struggle against foreign occupation in his African homeland" – i.e., Eritrea. (Def. Mem. at 1; see also id. at 5). First, even were this claim true, the defendant's political motivations for seeking to enlist in a brutal terrorist organization do little to mitigate his decision. In any event, however, the defendant's assertions regarding his motivations are belied by the record. At no point during his interviews with the Nigerian SSS, the Nigerian Police, or the FBI, did the defendant state that his jihadist mission was connected in any way to Eritrea. Rather, the defendant plainly stated that the purpose of his trip in 2009 was to support the terrorist group al Shabaab: "I secretly went to Turkey without anyone knowing about me. When I entered Somalia I went to 'al Shabab" [sic] house. My intent is to go to the training camp so I can be ready for anything; and I could defend myself and help the 'shabab' if need be." (PSR ¶ 14). There, he received training in improvised explosive devices. (PSR ¶¶ 14-15). Indeed, the defendant's actions after he sought to train with al Shabaab belie the suggestion that his objectives in seeking terrorist training were focused solely on Eritrea, for after the defendant did not receive full military training from al Shabaab, he traveled onto Mali and sought to join yet another terrorist enterprise. In particular, he agreed with "Bilal" – a member of the terrorist group Jamaat Jihadiya – to perform kidnappings and robberies for Bilal. (PSR ¶ 28). That the defendant has repeatedly received terrorist training in support of his deadly jihadist mission is no accident and counsels in favor of a sentence that will provide requisite specific deterrence.

There are few threats to the national security and the way of life greater than someone who chooses to leave his home and family in order to serve as an operative for a foreign terrorist organization and attempts to receive deadly training the only purpose of which is to wage an attack against innocent victims. The defendant exploited the freedom and the opportunities provided to him in Sweden to further his and al Shabaab's violent ends. He traveled thousands of miles to Africa, armed himself with a semi-automatic rifle and grenades, received training in explosives and sought further training in terrorist tactics, all in an effort to support an organization devoted to accomplishing its aims through violence, including against innocent civilians. The defendant's deep commitment to so doing demonstrates the risk that he poses to the public and the need for deterrence in this case. Accordingly, only one sentence – a Guidelines Sentence of 120 months' imprisonment – is sufficient for this defendant.

## Conclusion

Based on the foregoing, the Government respectfully submits that a Guidelines Sentence of 120 months' is appropriate in this case.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
BENJAMIN NAFTALIS
JOHN P. CRONAN
RACHEL P. KOVNER
Assistant United States Attorneys
(212) 637-2456/-2779/-2470

cc: Defense Counsel (by ECF)